KATE E. WALTON v. L. A. BRISTOL, Receiver of Piedmont Bank, Morganton; THE NATIONAL BANK OF WILMINGTON.

(Decided December 12, 1899.)

*Married   Woman's   Property—Real,   Personal—Power   to Convey, Art. X, Sec. 6, of the Constitution—Power to Charge Her Separate Estate, The Code, Sec. 1826.*

1. The power of a married woman to convey her property, real or personal, is regulated by the Constitution, Art. X, sec. 6, and must be exercised by the written assent of her husband.

2. Her power to make contracts charging her separate estate is regulated by The Code, sec. 1826, which requires a similar assent.

3. Her property may not be charged or disposed of by her husband without her assent.

4. Where a married woman wrote her name upon and across the back of a $1,250 note belonging to her, to secure which was another note for $615, hypothecated by the payee, L. A. Bristol, and her husband, E. S. Walton, now dead, delivered the same (both notes) to the Piedmont Bank as collateral security to his indebtedness due said bank, which became increased by further dealings to $3,000, when Walton executed his note for that amount, indorsed by the Piedmont Bank, and borrowed the money from the National Bank of Wilmington, with which sum he paid off his indebtedness to the Piedmont Bank, which retained his wife's notes, by agreement with her husband, as collateral security for its indorsement of his $3,000 note to the Bank of Wilmington: *Held*, that this last arrangement required the assent of the wife, of which there was no evidence.

CIVIL ACTION for the immediate possession of certain promissory notes, claimed as the property of plaintiff, and held by defendant L. A. Bristol, receiver of the Piedmont Bank of Morganton, tried before *McNeill, J.,* at Spring Term, 1899, of the Superior Court of BURKE County.

Jury trial was waived, and the facts were found by his Honor, who rendered judgment against the plaintiff, and she excepted and appealed to the Supreme Court.

The facts found by his Honor are fully recapitulated in the opinion.

*Avery & Avery,* and *Avery & Ervin,* for appellant.
*S. J. Ervin,* for appellee.

MONTGOMERY, J., writes the opinion.
CLARK, J., writes dissenting opinion.

MONTGOMERY, J. This is an action on the part of the plaintiffs to recover of the defendants the possession of certain personal property consisting of certain promissory notes and another paper writing mentioned in the complaint; one of the notes being in the sum of $1,250, executed on the 18th March, 1893, by S. Huffman, L. A. Bristol, J. M. Huffman & Co.,and J. H. Pearson, to J. V. Blackwell, or order, with certain credits endorsed thereon. The other note was in the sum of $615,executed by A. R. Buffaloe and C. E. Buffaloe to L.A. Bristol. The last-mentioned note was hypothecated by the payee,L. A. Bristol,with Blackwell, the payee of the first-mentioned note, as collateral security to that note. The other paper writing mentioned in the complaint is the assignment and transfer of the Buffaloe note as a security for the first-mentioned note. A jury trial was waived, and the facts were found by his Honor, which were in substances,as follows: The payee, J. V. Blackwell, of the first note, was the father of the plain-

tiff in this action, and after his death the note was assigned by his executor, I. T. Avery, to her as a part of her share of her father's estate. Afterwards the plaintiff, who was then a married woman, the wife of E. S. Walton, now deceased, in the language of the finding of fact, "wrote her name upon and across the back thereof (the note), and her husband, E. S. Walton, delivered the same to the Piedmont Bank of Morganton, N. C., as collateral security to an indebtedness then due and owing by him to the said bank on account of overdrafts, and the same was accepted by the bank for this purpose, the bank and the said E. S. Walton thereafter continuing to have mutual dealings, the bond at all times remaining in the possession of the bank." After that time the indebtedness of the husband to the bank became increased by overdrafts in a large amount until it amounted to about $3,000. That amount was borrowed from the other defendant, the National Bank of Wilmington, N. C., by the husband, E. S. Walton, and for which he executed his note payable to that bank. That note was endorsed by the Piedmont Bank upon agreement with the husband that the $1,250 note should be placed by the husband with it as security against loss by reason of its endorsement of the $3,000 note, and in order to secure the payment of that note. At the time of the loan by the Wilmington bank the husband, E. S. Walton, by letter, acquainted the Wilmington bank with the agreement between him and the Piedmont Bank. Later, E. S. Walton, the husband, wrote to the Wilmington bank that the $1,250 note was deposited with the Piedmont Bank as a collateral security to the endorsement of the $3,000 note. The amount realized on the $3,000 note from the Wilmington bank was applied by E. S. Walton to the payment of his indebtedness to the Piedmont Bank. The $3,000 note is still due and unpaid, and E. S. Walton is dead, and

his estate is insolvent.    Since these transactions the Piedmont
Bank has failed; L. A. Bristol is the receiver, and was in
possession of the note and the other paper writing mentioned
in the complaint at the time this action was commenced.

Upon the finding of facts substantially set out as above
stated, it was considered and adjudged by the Court below
that the plaintiff was not entitled to the possession of the
note sued for, and the plaintiff appealed.

The contentions of the plaintiff, are: First, that if the
endorsement and transfer of the note by the plaintiff be con-
sidered as a sale or conveyance of the same to the Piedmont
Bank, it was not executed with the written assent of the hus-
band, as was required by Art. X, sec. 6, of the Constitu-
tion, and was therefore invalid.   Second, that if the endorse-
ment be considered as an attempt by the wife, the plaintiff, to
charge her separate estate, the husband not having entered
his *written* assent thereto, the attempt must fail, because it
was prohibited under sec. 1826 of The Code; and, third,
that if it be considered as an attempt by the wife to pass the
title to the property in the note to her husband, it was inef-
fectual, because it was not made according to the require-
ments of sec. 1835 of The Code.

The defendants' contentions are: First, that the endorse-
ment by the wife was effectual to vest the property in the
Peidmont Bank, for they say that a married woman has a
right, with the verbal assent of her husband, to sell or dispose
of her choses in action, and that the law has drawn a line
between the executed and executory contracts of married
women.   Second, that upon the endorsement by the wife of
the note, and the placing it in the hands of her husband, he
was enabled to transfer it to the defendants, and they being
innocent purchasers for value are not affected by the fact that
she was a married woman.   Third, that by virtue of the

agreement between E. S. Walton, the husband, and the Piedmont Bank, and the subsequent agreement between them and the Wilmington bank, in reference to the $3,000 note, the $1,200 note in the hands of the Piedmont Bank should be applied to the benefit of the Wilmington bank.

In the beginning of the examination of the contentions of the parties, it may be said that the aspect of the case which is presented as falling under the prohibition of sec. 1835 of The Code may be eliminated from our consideration, for it appears from the facts found that the note was not attempted to be given to the husband by the wife. It was endorsed by her, and then taken by the husband to the Piedmont Bank, and delivered by him to the bank as a collateral security to a then existing indebtedness of the husband for overdrafts, and it was accepted by the bank for that purpose.

If the endorsement by the wife be considered in the view of an attempt on her part to convey her property, her separate estate, to the defendants, then the attempt must fail, for she could not do that without the written assent of her husband, and that was never had.  Art. X, sec. 6, of the Constitution, is in these words:  "The real and personal property of any female in this State, acquired before marriage, and all property, real and personal, to which she may, after marriage, become in any manner entitled, shall be and remain the sole and separate estate and property of such female, and shall not be liable for any debts, obligations or engagements of her husband, and may be devised and bequeathed, and, with the written assent of her husband, conveyed by her as if she were unmarried."  The Constitution as we have seen, so far as the wife's power to convey her separate estate is concerned, makes no difference between *real* property and *personal* property.  If she undertakes to convey either species of property, the *written* assent of her

husband must be had. In the brief of defendants' counsel it is said: "But aside from all that, it would be a monstrous doctrine in our law that a married woman can, with the verbal assent of her husband, dispose of an article of personal property or endorse a note or draft, and receive the proceeds thereof, and then recover such security or property on the ground that she did not have the written consent of her husband. If such be the law, then her coverture becomes a sword instead of a shield. Certainly, if such be the law, no reported cases can be found in this State to sustain it, and none should be found." But the *Constitution,* as we have seen, in the section we have quoted, distinctly requires the written assent of her husband in order to enable the wife to convey her separate *personal* property, and certainly no reported cases can be found in the Reports of this State against that constitutional requirement, and in the language of the brief, "none should be found." That a married woman should be able to draw her money out of a bank where it is deposited, or to receive payment of a note due to herself without the *written* assent of her husband, is altogether a different thing from *conveying* her property. In the first-mentioned cases, she brings into her estate all that she is entitled to, while in a sale of conveyance of her personal property without the assent of her husband she may be defrauded in the facts connected with the transaction or in the value of her property, and the Constitution, to doubly guard her property, requires the assent of her husband to be in writing.

The defendants' counsel cited us to the cases of *Taylor v. Sikes,* 108 N. C., 724, and *Kirkman v. Bank,* 77 N. C., 394. In the first-mentioned case, the transaction having occurred in Maryland, and no proof to the contrary having been introduced, the Court assumed that the common law prevailed in Maryland and applied the principles of the common law to

the facts in the case.    In the case of *Kirkman v. Bank,* the wife drew out of the bank a sum of money on her draft or order without the written assent of her husband, and after her death he, as administrator of his deceased wife, brought suit against the bank to recover the amount so paid to the wife.    The Court said that he could not recover against the bank, that the wife was not "conveying" her property or "disposing" of it, that she was only "receiving" her property. So it is seen that the cases of *Taylor v. Sikes* and *Kirkman v. Bank,* not only do not support the position of the defendants' counsel, but are authorities against it.    Again, if the endorsement of the note by the plaintiff and its being deposited with the Piedmont Bank for the purposes found by his Honor be considered in the view of an attempt to charge the separate estate of the wife, it may be answered that it was for the benefit of the husband alone, and that he never gave his written assent to the transaction.    As to the agreement made between the husband, E. S. Walton, the Piedmont Bank, and the Wilmington bank, in reference to the hypothecation of the $1,250 note to secure the payment of the $3,000 of the husband to the latter bank, and to save harmless the Piedmont Bank for its endorsement of the $3,000, it appears that the husband did make that agreement in *writing,* but the trouble is that the wife never gave her consent to that arrangement, and did not endorse the note for that purpose. The case of *Bates v. Sutton,* 117 N. C., 94, cited in the brief of defendants' counsel, has no application here in any aspect, for the husband there gave his consent in writing to the purchase of the goods by the wife on account of her own separate estate; and her application for credit was in writing and contained a clause charging her separate estate for the same. As to the last position of the defendants' counsel, that is, that an endorsement by a married woman of a note belonging to

WALTON *v.* BRISTOL.

her conveys the property therein to the holder who has paid value for it, and who was ignorant of the fact that she was under coverture at the time of endorsement, we think it can not be maintained. The purchaser of such a note can not place a married woman in North Carolina, in her attempt to contract, in the position of a person free to contract. Our Constitution and our laws will not permit a married woman to make any contracts without the written assent of her husband, whether her coverture be known or not, except those authorized under sec. 1826 of The Code. But there was no finding of his Honor as to whether either of the banks knew that the plaintiff was not a married woman.

For the reasons given, we find error in the judgment of the Court below, and the same is

Reversed.

CLARK, J., dissenting. The Constitution of North Carolina, Art. X, sec. 6, provides: "The real and personal property of any female in this State, acquired before marriage, and all property, real and personal, to which she may, after marriage, become in any manner entitled, shall be and remain the sole and separate estate and property of such female, and shall not be liable for any debts, obligations or engagements of her husband, and may be devised and bequeathed, and, with the written assent of her husband, conveyed by her as if she were unmarried."

To anyone who reads this section, as it is written, it must be clear that the property rights of a married woman remain as if she were unmarried, with the single exception that she can not convey without the written assent of her husband. That is the sole restriction upon her disposition of her property while living, and there is not even that restriction upon her disposition of it at death. The emancipation of married

women as to their property rights could not be more unequivocal. Her property is to *remain* her sole and separate estate and property, as if she were unmarried, except she can not convey without her husband's written assent. With that exception, her property rights remain unimpaired and unchanged by marriage. To the rights guaranteed them by the Constitution, married women are entitled as fully as anyone else. There is no restriction upon her *jus disponendi* or using her property, as "if she were unmarried," save in the one respect recited in the constitutional guarantee. There is no disability whatever imposed upon her freedom to contract, or avoiding the possible effect thereof upon her property. There is no constitutional presumption that a married woman, by the fact of marriage, becomes less intelligent, or less competent to contract than "if she were unmarried"—a state in which she is as free to contract as any man.

Two arguments have been advanced why the courts should exercise a paternal supervision of the Constitution and construe that it does not mean as to married women what the language unmistakably and unequivocally says.

The first is, that, as married women can not convey without the written assent of the husband, to allow them to contract without such assent would be to allow them to do indirectly what they can not do directly. That is an argument which might have been addressed to the Constitutional Convention, and doubtless was, but as it did not induce the Convention to shackle the property rights of married women by inhibition of their contracting on the faith and credit of property ownership, the courts should not do it.

The statute of frauds for more than two centuries has rendered invalid conveyances of realty unless in writing, but it has never occurred to any court to hold that no one could be liable upon a verbal contract whereby his realty

could be subjected to sale, because "that would permit to be done indirectly what can not be done directly." The constitutional emancipation of married women should bear the same construction as has been for centuries given to the provision in the statute of frauds. A requirement of "writing" in one case, and of "written consent" in the other, as to "conveyance" can not be construed differently, so as to forbid "contracts" in the one case and not in the other.

The other objection is that the absolute property rights of a married woman "as if she remained unmarried" are in conflict with the common law precedents. That is exactly why the provision has been put in the Constitution, which is, and was intended to be, a complete break with the past in this as in several other respects.

In *Shuler v. Millsap,* 71 N. C., 298, SETTLE, J., says: "The Constitution of 1868, and the laws made in pursuance thereof, have so changed preexisting laws on the subject of the estates of females, and the remedies affecting the same, that neither the elementary books nor our own Reports afford us much light in determining the questions presented by the record. We are called upon to *make a new departure, leaving old ideas behind, and adapting ourselves to the new order of things.*"

In *Walker v. Long,* 109 N. C., 511, MERRIMON, C. J., says: "The Constitution, Art. X, sec. 6, has wrought very material and far-reaching changes as to the rights respectively of husband and wife in respect to her property, both real and personal, and enlarged her personality and her power in respect to, and control over her property."

There are many other judicial enunciations recognizing the radical and complete break with the common law as to the status of married women. Whether that law was based upon the conception that a single woman (who had full con-

trol of her property) by the fact of marriage gave conclusive proof of imbecility and incompetency, or that only those women who were lacking in discretion married, whatever the basis, the constitutional provision of 1868 swept away the disabilities of married women and guaranteed them the same rights of property "as if remaining unmarried," save that as to conveyances there must be the written assent of the husband.

The fanciful doctrine of "charges in equity" is a late creation by purely judicial legislation, for there is not a line of any statute to support it, and it is in direct conflict with the beneficent and liberal provision of the Constitution. The oft-quoted sec. 1826 of The Code, requires only written assent of the husband—nothing more. To require a "charging" is harking back to the time when a married woman not only had no control over her property, but was a chattel herself, and when Shakespeare correctly expressed the English law as to wives by making Petruchio say:

> " I will be master of what is my own ;
> She is my goods. my chattels ; she is my house ;
> My household stuff, my field, my barn,
> My horse, my ox, my ass, my anything."

The Constitution does not disable a married woman to contract, but on the contrary leaves her as free to do so as her single sister. It follows that when the plaintiff endorsed the note in bank and placed it in the stream of commerce, anyone who bought it or loaned money on it in the absence of fraud or collusion (which is not charged) got a good title to it as against her, as fully as if she had been a single woman or a man.

The *jus disponendi* is inherent in the ownership of property, and remains in the married woman by the constitutional provision that her property is to remain hers as if she were

unmarried, with the single exception of conveyances, which
word refers to cases in which "conveyances" are required,
i. e., deeds and leases of realty and mortgages of realty or per-
sonalty. No "conveyance" is required to pass personalty
except by mortgage. This Court has held that the Legisla-
ture can not deprive anyone of the *jus disponendi,* which is a
vested right protected by the United States Constitution.
*Hughes v. Hodges,* 102 N. C., 239; *Bruce v. Strickland,* 81
N. C., 267. But if it were held that the Legislature could
restrict the "sole ownership" of her property guaranteed to a
married woman by the provision of The Code, sec. 1826, it is
to be observed: (1) That though that section has strangely
enough been construed to apply to conveyances, when in its
terms it applies to contracts only, by the same decisions the
requirement of the husband's written assent has always been
restricted to deeds and mortgages; and (2) that if it applied
to personalty, the husband has here given his written assent by
his letter to the Wilmington bank. It is true such assent was
subsequent to the endorsement of the note in blank by the
wife, but the assent need not be simultaneous. *Bates v.
Sultan,* 117 N. C., 94.

Nor indeed is the endorsement in blank of a promissory
note "a contract to affect her real or personal estate" in the
purview of this action. The note is secured by mortgage,
and appears to be collectible. This is not an action to make
her chargeable with its payment (when that question might
arise), but an action by her to recover possession of the note
which she has endorsed, allowed to be put in deposit as col-
lateral, and which is now so held with the written assent of
the husband. Nor does the fact that the note was past due
when endorsed cut any figure as to the plaintiff. The doc-
trine of sets-off in case of paper passed after maturity applies
in favor of the maker, and not between the payee or endorser
and endorsee.

It can hardly be contended that the endorsement of a bill or note in blank is a "conveyance," for if so, all such endorsements are void for want of a grantee. But if it were a conveyance, there is, as above said, the written assent of the husband. *Bates v. Sultan, supra.* The word "conveyance" ordinarily refers to deeds of realty, or mortgages of either realty or personalty, i. e., to cases in which a "conveyance" is required. *Kelly v. Fleming,* 113 N. C., 133. And such is its meaning in this provision of the Constitution. It can not mean that a married woman can not sell a horse, a cow, a ear-ring, or cash a check without the written assent of her husband.

In this day, when married women own so large a share of stocks, bonds, promissory notes, drafts and checks, it is of far-reaching consequence to hold that the endorsement by them of such papers is invalid, especially when (as in this case) the paper endorsed by the wife is tendered as a collateral in a written instrument containing not only the written assent of the husband but his request that it be so used. Commercial paper is sexless. When by proper endorsement it is put into the currents of trade, the taker of it before maturity should regard it as a "courier without luggage," and not be held to inquire and scrutinize whether any of the endorsers were or were not widows, wives or spinsters. And if he takes after maturity, he should be liable only to sets-off in favor of the maker. Apart from the constitutional rights of married women over their property being the same as that of single women (except as to "conveyances" which refer to deeds and mortgages), the commercial law has never before held the taker of commercial paper to scrutinize the sex or marital condition of endorsers of such paper. The endorsement by a married woman payee of a check stands on the same footing as her endorsement when payee of a promissory

note, so far, certainly as entitling the holder to receive the proceeds of the check or note, which is the only matter at issue here.

The recent statute, revising and codifying the law of negotiable instruments, chap. 733, Laws 1899, was·drawn by a committee of able lawyers appointed by the American Bar Association to secure uniformity of legislation upon the subject, and has been adopted by many States. In it, there is no intimation that the doctrine of the disability of married women has been imported into the mercantile law or invalidates the endorsement of a promissory note by a married woman. This is at least a legislative construction. It must further be remembered that in the present case it is not even found that the holders of this paper, taking when so endorsed, knew that the endorser (who was not the original payee), was a married woman.

Even at common law, the endorsement of a note by a married woman was valid to transfer the note (though not to make her liable as endorser) if the husband was present (*Menkins v. Heringhi,* 17 Mo., 297), or if made with his authority or consent (*Prestwick v. Marshall,* 4 C. & P., 594; *Stevens v. Baale,* 10 Cush., 291; *Mudge v. Bullock,* 83 Ill., 22; *McClain v. Weidemayer,* 25 Mo., 364; *Nimes v. Bigelow,* 45 N. H., 343), and the husband's authority may be presumed from his conduct or subsequent ratification. *Prince v. Brunette,* 1 Bing. N. C., 435; *Mudge v. Bullock, supra; Coxlia v. Connelly,* 15 Ind., 141; *Cobb v. Duke,* 36 Miss., 60. It would be strange, therefore, if since the liberal provisions of our Constitution an endorsement of a promissory note by a married woman should now be invalid to carry title to it, especially under the circumstances of this case.