## VANN v. EDWARDS.

(Filed June 1, 1904).

1. MARRIED WOMEN—*Husband and Wife—Negotiable Instruments—Personal Property—Const. N. C., Art. X, sec. 6—The Code, sec. 1826.*

   A married woman may dispose of her property by gift or otherwise without the assent of her husband, unless the law requires the disposition of it to be evidenced by a conveyance or a writing.

2. FORMER ADJUDICATION—*Appeal—Supreme Court.*

   The supreme court, on a second appeal is not precluded under the doctrine of the law of the case from passing on a question not determined on the first appeal.

   MONTGOMERY, J., dissenting.

ACTION by T. E. Vann, administrator of Darius Edwards, against D. K. Edwards, heard by *Judge M. H. Justice* and a jury at Fall Term, 1903, of the Superior Court of HERTFORD County. From a judgment for the plaintiff the defendant appealed.

*Winborne & Lawrence* and *George Cowper,* for the plaintiff.

*L. L. Smith,* for the defendant.

WALKER, J.  This action was brought to recover the amount of two notes, one for the sum of $450 and the other for the sum of $500.  We are concerned only with the latter note as the other is not in controversy.  The note for $500 was executed by the defendant to his mother, Sarah F. Edwards, on the 8th day of June, 1888, and was payable eight years after its date with six per cent. interest.  The defendant, having admitted the execution of the note, avers that it was transferred, endorsed and given to him by his mother, and he also avers that if the transfer from his mother was void he acquired title to the note by gift from his father. At the time the note was executed, and also at the time it was alleged to have been transferred to the defendant by his mother, Darius Edwards, the husband of Sarah F. Edwards, was living and did not assent to the transfer, and the same was made, if at all, without his knowledge and with the belief on the part of Mrs. Edwards and the defendant that he would not assent to the transfer.  There was evidence in the case tending to prove that after Mrs. Edwards' death the note passed into the possession of her husband, who survived her, and remained in his possession until his death.  There was evidence, on the contrary, which tended to prove that while the note was in the possession of Darius Edwards after the death of his wife it was delivered by him to the defendant, who kept it until the death of his father and had possession of it until this suit was brought, when it was handed by the defendant's wife to one of the defendant's attorneys.  When the case was here before it was held that the defendant's possession of the note after the death of his father, in whose possession it had been subsequent to the death of his wife, who was the original owner and holder of the note, would, if established, raise a presumption that such possession was lawful and that he is the owner of the note, and a new trial was granted to the defendant because

of an erroneous ruling in the Court below upon this point. At the second trial an issue was submitted to the jury as to the ownership of the note, the plaintiff asserting title to it as the administrator of Darius Edwards. The jury found against the defendant, and judgment having been rendered upon the verdict for the plaintiff the defendant excepted and appealed. The only exceptions which we need notice were taken to the charge of the Court, and to an instruction of the Court given to the jury at the plaintiff's request, which is as follows: "If you find from the evidence that the defendant acquired possession of the $500 note by delivery from his .mother, without the knowledge or consent of his father, Darius Edwards, then no title to the note would pass to the defendant thereby; and if that were his only claim to the note you should answer the first issue 'Yes.'" The Court also charged the jury, among other instructions, to which no exception was taken, as follows: "If the note was executed by the defendant to his mother and by her endorsed and transferred to the defendant without her husband's knowledge or consent, and that was his only claim, that would avail the defendant nothing, and the note would have passed to the husband as his property upon the death of his wife, subject to the payment of her debts." Defendant excepted. These two exceptions are in substance the same and may be considered together, and they involve the question whether a married woman can make a valid transfer to another of a note belonging to her without the written consent of her husband.

The Constitution (Article 10, section 6) provides as follows: "The real and personal property of any female in this State, acquired before marriage, and all property, real and personal, to which she may, after marriage, become in any manner entitled, shall be and remain the sole and separate estate and property of such female, and shall not be liable for any debts, obligations or engagements of her husband, and

may be devised and bequeathed, and with the written assent of her husband, conveyed by her as if she were unmarried." It is provided by The Code, section 1826, that, "No woman during her coverture shall·be capable of making any contract to affect her real or personal estate, except for her necessary personal expenses, or for the support of the family, or such as may be necessary in order to pay her debts existing before marriage, without the written consent of her husband, unless she be a free trader, as hereinbefore allowed."

Our answer to the question we have stated must be in the affirmative. The decision of the case turns upon the construction of section 6 of Article X of the Constitution, for if by that section a married woman is vested with the power of disposing of her personal property, such as the note upon which the suit was brought, this power cannot be divested or taken from her by any act of the Legislature, and section 1826 of The Code can have no operation in such a case, assuming it to be fully sufficient in its scope to embrace her executed contracts of sale or gifts.

It is provided by the Constitution, which is the higher and indeed the supreme law to which all conflicting legislation must yield, that the property of every female, whether acquired before or after her marriage, shall be and remain her sole and separate estate and shall not be liable for any of the debts, obligations, or engagements of her husband. If this were all of the section, we would have to conclude that as a married woman is thus vested with full and complete ownership of things real and personal acquired by her before or after her marriage, having both the legal and equitable title, she must necessarily have also acquired every· right which inheres in or is incidental to such ownership, and the most important and most valuable among them is the right of alienation—or what is commonly known in the law as the *jus disponendi.* While this may not accord with the view

taken of that section in one or two of the cases, it will be found upon examination that they did not involve a decision of the question of a married woman's right to dispose of her personal property, but of her power to contract so as to bind her property generally, and it was held that, notwithstanding the provision of section 6 of Article X of the Constitution, the disability of coverture remains as it was at common law and prevents her from making a valid executory contract.

It will be observed that it is ordained by the Constitution that all that a married woman has or acquires in things real and personal shall be her sole and separate estate and property. The word "property" is of very broad signification. It is defined as "rightful dominion over external objects; ownership; the unrestricted and exclusive right to a thing; the right to dispose of the substance of a thing in every legal way, to possess it, to use it and to exclude every one else from interfering with it. Property is the highest right a man can have to anything, being used for that right which one has to lands or tenements, goods or chattels, which no way depends on another man's courtesy. A right imparting to the owner a power of indefinite user, capable of being transmitted to universal successors by way of descent, and imparting to the owner the right of disposition. * * * The right of property is that sole and despotic dominion which one man claims and exercises over the external things of the world in total exclusion of the right of any other individual in the universe. It consists in the free use, enjoyment and disposal of all a person's acquisitions without any control or diminution save only by the laws of the land." Black's Law Dict., pages 953, 954. The word "estate," which is also used in the Constitution, denotes the interest which any one has in lands, or in any other subject of property. An estate in lands, tenements and hereditaments, says Blackstone, signifies such interest as the tenant has therein. 2 Bl. Com.,

103. It also signifies the condition or circumstance in which the owner stands with regard to his property. Both words are also used to describe the thing, real or personal, in which one has an estate or the subject-matter of ownership, or over which the right of property is exercised, and in this sense, perhaps, they were intended to be used in the Constitution. But the very word "property" implies the exclusive right of possessing, enjoying and disposing of a thing and, when used subjectively, it means that with respect to which this right exists or that which is one's own. So it must be admitted that, if there were no words in section 6 of Article X of the Constitution to limit the scope of that part of the section which we have just quoted, a married woman would have the same dominion over her separate estate and property as if she were a *feme sole*. But there are such words of limitation, and how and to what extent they restrict the right of alienation is the difficult and delicate question presented for solution. After exempting her property from any debt, liability or obligation of her husband, it is provided that she may devise and bequeath the same. This power is absolute. She may will her property with the same freedom as if she were unmarried or *sui juris*. And by the last provision of the act she may, with the written assent of her husband, "convey" her property as if she were a *feme sole*. A correct analysis of this section brings us to this conclusion: That a married woman may dispose of her property in any way she may see fit to do so, except that when she conveys it the written assent of her husband is essential to the validity of her conveyance. But what is meant by the word "convey?" The act by which she passes to another the title to her property must in law be a conveyance. Discussing a kindred subject in *Kelly v. Fleming,* 113 N. C., at page 138, this Court, by *Mr. Justice MacRae,* says: "The word 'convey' in its broadest significance might embrace any transmission of

possession, but we are restrained to its legal meaning, which, ordinarily speaking, is the transfer of property from one person to another by the means' of a written instrument and other formalities. Rapalje & Lawrence Law Dict., 'Convey; Conveyance.' According to Webster a conveyance is 'an instrument in writing by which property or the title to property is conveyed or transmitted from one person to another.' The meaning of this word being well understood at common law, it must be understood in the same sense when used in a statute. *Smithdeal v. Wilkerson,* 100 N. C., 52." A conveyance is "an instrument in writing under seal (anciently termed an 'assurance') by which some estate or interest in lands is transferred from one person to another; such as a deed, mortgage," etc. Black's Law Dict., page 273, citing 2 Blackstone. In *Pickett v. Buckner,* 45 Miss., 245, the Court, in construing the dower, act of that State, says: "In employing the term in the dower act, 'conveyance,' or 'conveyed,' we suppose that the Legislature meant the sense in which the word is ordinarily used in our jurisprudence. It is a technical or quasi-technical word of precise and definite import. As defined by Bouvier (1 Law Dict., 346), 'conveyance' 'is the transfer of the title to land by one person to another.' The instrument itself is called a conveyance." In *Nickell v. Tomlinson,* 27 W. Va., 720, the word "convey" is thus defined: "But the language now used is probably just as open to criticism as the language used one hundred years ago. The language now used is: 'shall operate to convey from the wife her right of dower in the real estate embraced in the deed.' Now 'convey' means transfer the title of land from one person or class of persons to another. (See Bouvier's Law Dict., Vol. I, page 399). Clearly an inchoate dower interest is no title to land. It is no estate present or future, vested or contingent, and the term 'convey' can be properly used only when the transfer of some 'estate in land'

is spoken of." Again, the Court says: "Conveyance is a transfer of an estate in land from one person to another." In *Thompson v. Hart,* 58 App. Div. (N. Y.), at page 449, the Court, in construing the word "convey" with reference to its sufficiency as a legal term to pass personal property, said: "Manifestly the word 'convey' is inappropriate to the transfer of personal estate."

In *Klein v. McNamara,* 54 Miss., 105, the word "conveyance" is said to be a general word and "comprehends the several modes of passing title to real estate. It is defined to be the transfer of the title of land from one person, or class of persons, to another." *Lambert v. Smith,* 9 Ore., 193; *Edelman v. Teakel,* 27 Pa. St., 27. Defining the word in *Jenckes v. Court of Probate.* 2 R. I., 255, the Court says: "The term 'convey' is a technical term, long known or used in deeds conveying real estate." We believe all the lexicographers generally adopt as the definition of the word "convey" the transfer of the title to realty, and of the word "conveyance" the instrument by which this is done. Anderson's Law Dict., page 254; 1 Bouvier's Law Dict. (1897), page 434; 1 Rapalje & L. Law Dict., 289; Abbott's Law Dict., 284. Blackstone emphasizes the distinction between instruments used in the alienation of "real estate" and those by which personal property and effects are transferred. "The former," he says, "being principally such as serve to convey the property of lands and tenements from man to man are commonly denominated *conveyances;* which are either conveyances at common law or such as receive their force and efficacy by virtue of the *Statute of Uses."* 2 Blk., 309; and, speaking again of conveyances, he says: "The legal evidence of this transmutation of property are called *common assurances* of the kingdom, whereby every man's estate is assured to him, and all controversies, doubts, and difficulties are either prevented or removed." 2 Blk., 294, 295. Referring to this definition

of Blackstone, the Court, in *McCabe v. Hunter,* 7 Mo., 357, says: "It has been argued that there is nothing in our statute concerning conveyances which requires an instrument conveying lands to be sealed. The statute uses the word 'conveyance' to designate all the instruments conveying lands from one to another. Blackstone says deeds which serve to convey the property of lands and tenements from man to man are commonly denominated conveyances. 2 Blk., 309. We have seen that in England the word conveyance carries with it the idea of a sealed instrument. This word is used by our Legislature in the sense in which it is understood in England." But if the framers of the Constitution used the word "convey" in its widest sense as meaning transfer of property or the title to property from one person to another by means of a written instrument and other formalities, and its substantive "conveyance" as signifying the instrument itself by which the transfer is effected (*Pronty v. Clark,* 73 Iowa, 55), we do not think it can affect the result in this case. The word "convey" must still be restricted in its operation to such property as is by law required to be transferred by a written instrument. The words "convey and devise" are technical terms relating to the disposition of interests in real property. It would not be technically or legally correct to speak of *conveying* personal property by a verbal sale of it, or even by a writing, any more than it would be to speak of devising it by last will and testament, not that a draftsman may not use a technical word to express his meaning without intending that it shall be construed in its strictly technical sense, but in the absence of anything to clearly indicate that the word was not intended to have its commonly accepted meaning in the law, but was used in some other and different sense, we must adopt the legal definition of the word, because, in the first place, it must be presumed to have been used in that sense, and, in the second, because it

would be unsafe to reject that well-understood meaning for another, unless the latter had been most clearly manifested. And this principle should especially apply to constitutions and statutes, which are generally written by those learned in the law and are intended to declare what the law shall be. It must be assumed in such a case that the state of the law and the meaning of its technical terms at the time of the enactment was known, for we are required in construing written laws, especially those changing the common law, to consider the old law and, in comparing it with the new so as to gather the intent, words of well known legal signification must have the meaning thus attached to them by the law, and especially must they be understood in the sense which they have acquired by actual judicial interpretation, unless by such construction we defeat the intention which clearly and distinctly appears from some other part of the enactment or from its context. It may be added that the framer of section 6 of Article X of the Constitution must have been familiar with the meaning of technical or legal terms, for he made the proper distinction between the disposition of realty and the disposition of personalty by will when he used the words "devise" and "bequeath." It may fairly be assumed that he knew also that a writing was not essential to the transfer of personalty, and that when he used the word "convey" he intended it should have its technical meaning.

There is another reason why the restriction upon the wife's right of alienation should be confined to that kind of property which can be transferred only by a written instrument. Section 6 of Article X of the Constitution provides that a married woman's separate estate and property may be conveyed by her with the written assent of her husband as if she were unmarried. Property in things personal, generally speaking, may pass from one person to

another by mere delivery or by word of mouth. An unwritten sale or gift is quite sufficient for that purpose. This being so, can it be supposed to have been intended by that section to require that, in every case where the wife makes a sale or gift of her personal property by delivery or by word of mouth, however small or however inconsiderable in value the article of property may be, the husband must give his written assent thereto; or, to put the case more strongly, is it intended by that section that, if the wife wishes to sell or give to another her personal estate or any part of it, however small that part, she cannot do so by delivery or by word of mouth, a usual and immemorial method of transferring such property, but she must, in every instance, reduce the transfer to writing in order that her husband may assent in writing to it, and that without this kind of written assent a valid transfer cannot be made. Either one or the other of the two alternatives must be adopted, unless the restriction upon her right to convey her separate estate and property is held to apply only to her realty, or to property the title to which can pass only by a written instrument. It further appears from an examination of section 6 of Article X of the Constitution that it was not intended to vest in the wife merely the naked title or power to hold in her own name this "sole and separate estate and property" without any of the usual incidents of ownership and without the right of direct control or dominion over it, but it was manifestly the purpose that, as it was vested in her own right, it should become her sole and separate property as if she were a single female, subject only to the limitations of that section. It is an enabling provision of the law and should be construed in the spirit which prompted its enactment, and, as it authorized the wife to take and hold property to her sole and separate use without the interposition of a trustee, and has thus made her capable

of holding it by herself and for herself, independently of
her husband, she should be adjudged to have the capacity of
disposing of it, except in so far as she may be expressly or
impliedly restrained. That this was the spirit and purpose
of the law-makers is evidenced by the fact that she is given
the absolute right to dispose of her estate by will, which is
certainly something more than the naked right to own and
possess it, and then she may also *convey* it. It is, therefore,
perfectly clear that it was intended she should have the right
of disposition, in one form absolutely, and, in another, under
certain restrictions. As she is vested with her property,
including the incidental right of disposing of it, *inter vivos,*
subject only to one condition, it must follow that in all other
respects her right of alienation is left free and unfettered.
The expression of the one limitation upon this right is the
exclusion of all others. When the law says that in one
case she shall be under the restraint of her husband, it
means necessarily that in all other cases she shall be free.
We may well ask why should a wife be permitted to devise
and bequeath her property real and personal, and be allowed
to convey only her real estate. If the use of the word "con-
vey" restricts the right of alienation to the real estate, as
we have shown that it does, then as to the personal property
she is left without the right of disposition, unless it was
the intention to confer upon her a general power to dispose
of her property, with the proviso that real estate should not
be conveyed without the assent of her husband. There is
no valid or sufficient reason for making any distinction
between the right to dispose of real property and the right
to dispose of personal property, which would deprive her of
the latter right. We think the true meaning of section 6 of
Article X is that a married woman may dispose of her
property without the assent of her husband, except in those
cases where a written instrument or conveyance is required

for that purpose. This construction of the Constitution seems to be strongly favored by the Court in *Withers v. Sparrow,* 66 N. C., 129. Referring to *Knox v. Jordan,* 58 N. C., 175, *Boyden, J.,* for the Court, says: "But the Court in that case seems unwilling to sanction the doctrine that, as to the separate estate of the wife, she was to be regarded as a *feme sole* in all respects as held in England and also in the State of New York. But however proper this unwillingness of the Court to recognize that doctrine might have been at the time of that decision, there can be no reason, since the adoption of our present Constitution, why the English and New York doctrine should not now be followed in our State." We understand the Court to mean that a married woman has under the Constitution the right to dispose of her separate estate in any manner, save in so far as she may be restricted to any particular method of alienation pointed out in that instrument, and not that she may contract generally so as to subject her separate estate at law to the payment of her debts, as would be the case if she were *sui juris.* We are not at all disposed to change or impair the doctrine so frequently announced by this Court with reference to the capacity of a married woman to contract. That question is not now directly before us. Nor do we think it necessary to disturb the principles established in *Frazier v. Brownlow,* 38 N. C., 237, 42 Am. Dec., 165; *Harris v. Harris,* 42 N. C., 111, 53 Am. Dec., 393; *Knox v. Jordan,* 58 N. C., 175, and more recently in *Pippen v. Wesson,* 74 N. C., 438; *Dougherty v. Sprinkle,* 88 N. C., 300; *Flaum v. Wallace,* 103 N. C., 296, and *Farthing v. Shields,* 106 N. C., 289, and still more recently in *Harvey v. Johnson,* 133 N. C., 352. Our decision of the question involved in this case does not conflict with what this Court has so often said, and which is thus clearly stated by *Ruffin, J.:* "At law a *feme covert* is incapable of making a contract of any sort,

135——43

and any attempt of hers to do so is not simply voidable, but absolutely void. If, however, she be possessed of separate property, a court of equity will so far recognize her agreement as to make it a charge thereon. But even in that case, and in that court, her contract has no force whatever as a personal obligation or undertaking on her part. Nor was there any change wrought in this particular by the alterations made in our court system under the Constitution of 1868, or by the adoption of the statute known as the 'Married Woman's Act.' It was in reference to those very alterations, and the effect of the statute, that the Court declared in *Pippen v. Wesson,* 74 N. C., 437, and *Huntley v. Whitner,* 77 N. C., 392, *that no deviation from the common law had been produced thereby as respects either the power of a feme covert* to contract, in the nature of her contract, or the remedy to enforce it; that as a contract remedy her promise is still as void as it ever was, with no power in any court to proceed to judgment against her *in personam."* *Dougherty v. Sprinkle,* 88 N. C., 304; *Flaum v. Wallace,* 103 N. C., 296. The Constitution does not remove the incapacity which prevents a married woman from contracting debts or pecuniary obligations. So far as her power to thus contract is concerned, the disability of coverture remains as it was at common law, except where changes have been made by statute. In this connection the language of the Court in *Pippen v. Wesson,* 74 N. C., at page 445, is appropriate: "We conceive that while it would be beyond the power of the Legislature to destroy or alter the essential qualities of the separate estate given by the Constitution, as by giving the personal property to the husband, by making the property liable for his debts or by destroying the wife's power of disposition; yet it is within its power to regulate the manner in which the separate estate shall be held, to prescribe what contracts and what dispositions of their estates, other than

those specifically authorized by the Constitution, married women may make, and by what forms and ceremonies all their contracts shall be made and authenticated, and their free consent thereto ascertained. The Legislature may abolish all the incapacities of married women, and give them full power to contract as *femes sole*. The question is, has it done so?"

In what respect the method of charging in equity a married woman's separate estate with liability for her agreements may be affected, if at all, by this decision, is not now presented for our consideration. We simply hold that without the assent of her husband she may dispose of any of her property, unless the law requires the disposition of it to be evidenced by a conveyance or a writing.

It is argued that the case of *Walton v. Bristol*, 125 N. C., 419, is at variance with the conclusion we have reached, but we do not think so. The conflict, if there is any, is more apparent than real. The note in that case, which belonged to the wife, was endorsed by her alone and deposited by her with the Piedmont bank as collateral security for her husband's indebtedness to that bank. His indebtedness having increased to the amount of $3,000, an arrangement was made by which the husband borrowed to the amount of his indebtedness from the Wilmington bank and gave his note to that bank for the loan, and with the proceeds realized on his note to the Wilmington bank he paid the debt due the Piedmont bank, which bank had endorsed his note to the Wilmington bank for his accommodation, upon an agreement with him that the note for $1,250 should be deposited with it as collateral security or indemnity for its endorsement, and the husband so notified the Wilmington bank by letter both before and after that bank loaned him the $3,000. The wife did not assent to and, so far as appears in the case, had no knowledge of this new arrangement. Upon these

facts, it is clear, we think, that as the wife could only be liable as surety for her husband by reason of the endorsement and deposit of her note at the bank (*Purvis v. Carstarphen*, 73 N. C., 575; *Trust Co. v. Benbow*, 135 N. C., 303; *Fleming v. Barden*, 126 N. C., 459, 78 Am. St. Rep., 671; 53 L. R. A., 316; 127 N. C., 214, 53 L. R. A., 316) the change in the arrangement fully discharged her, whether it be regarded as an extension of the time of payment to her husband, as a novation of the debt or as a payment of the debt and an extinction of her liability, the last being the correct view, as we think. If the wife did not assent to the agreement by which her note was to be retained by the Piedmont bank as indemnity against any loss resulting from its endorsement of her husband's note to the Wilmington bank, and could not, in any view of the matter, be bound thereby, why inquire whether her endorsement of the note was valid and binding upon her? The endorsement had been virtually cancelled and nullified by the payment of the note due the Piedmont bank, whether it was originally valid or not, and the Court so treated it, for it says, "The wife never assented to the new arrangement," and was, therefore, not bound. The question as to the validity of her endorsement was not in the case, but, if it was, we would not be inclined to follow the decision in so far as it conflicts with the conclusion which we have reached in this case. The question was not presented in *Rawls v. White*, 127 N. C., 20, which is also cited for the plaintiff.

But the plaintiff's counsel, in his well-prepared brief, insists that the point was decided in this case when it was here on a former appeal, 128 N. C., 425, and also on the rehearing of that appeal, 130 N. C., 70, and that it is *res judicata* and has become the law of the case whether the decision was right or wrong. We may admit the general proposition that the decision of a court of final resort upon

a given state of facts becomes the law of the case upon a second trial and another appeal in regard to those facts, if they are substantially the same as those upon which the former decision was made; and yet, with that principle conceded, we do not think the question we are now considering has been finally adjudicated as between the parties to this suit so as to foreclose any further discussion of it and make any expression in either of the former opinions upon that question, whether correct or not, the law of the case. An examination of the record in the first appeal will show that the only question presented and upon which the decision therein could have been made, was whether the defendant's possession of the note raised a presumption that he was the lawful holder of it or, to speak more accurately, raised a presumption that the note had been paid. In passing upon this question it could make no difference whether the note had been legally endorsed to defendant by his mother or not, for if it had not been, he would still be entitled to the benefit of the presumption raised by the law from the fact of his possession of the note. When this Court decided with him in regard to the presumption, it was not necessary to consider the other question as to the legal effect of the endorsement of his mother even if it had been presented in a way to call for an adjudication of this Court upon it. We have, therefore, concluded that the question as to the validity of the endorsement of the note by the defendant's mother to him is now open for our consideration.

The question as to the right of a married woman to dispose of her personal property without the written consent of her husband is directly and squarely presented in this case by the defendant's request for instructions and the charge of the Court to which exception was taken, and it is the first time, as we think, that it has been so presented.

Having held that the transfer of the note by his mother

to the defendant was valid, it follows that the Court erred
in refusing to give the instruction requested by the defend-
ant and in giving the instruction to which he excepted;
because if the endorsement and delivery of the note to the
defendant constituted a valid gift of it to him, the fact that
the jury have found that he did not have possession of the
note at the time of his father's death should not defeat his
title to it acquired by the gift, as the defendant may be able
to show that even if his father had possession of the note at
the time of his death, and there is therefore a presump-
tion in favor of plaintiff, he is himself the real owner
of it by virtue of the gift from his mother. This is a ques-
tion for the jury to decide upon all the facts of the case and
under proper instructions from the Court, and by holding
that defendant acquired no title to the note by his mother's
endorsement, the Court deprived him of the use of that impor-
tant fact in developing his defense.

The error thus committed entitles the defendant to another
trial.

New Trial.

Montgomery, J., dissenting. I still am of the opinion
that the law on the subject of the right of a married woman
to dispose of her separate estate, whether it consists of real
or personal property, was properly decided in the case of
*Walton v. Bristol,* 125 N. C., 419. The opinion in this case
overrules that case. In *Walton v. Bristol, supra,* the Court
said: "The Constitution, as we have seen, so far as the wife's
power to convey her separate estate is concerned, makes no
difference between *real* property and *personal* property. If
she undertakes to convey either species of property, the writ-
ten assent of her husband must be had." Article X, section
6, of the Constitution is in these words: "The real and per-
sonal property of any female in this State, acquired before

marriage, and all property, real and personal, to which she may, after marriage, become in any ·manner entitled, shall be and remain the sole and separate estate and property of such female, and shall not be liable for any debts, obligations or engagements of her husband, and may be devised and bequeathed, and, with the written assent of her husband, conveyed by her as if she were unmarried."

It will be seen from reading that section of the Constitution that the words "real and personal property" are always associated, and that the copulative conjunction "and," leading the last clause, connects both real and personal property with the mode of conveying them. If inconveniences arise practically in the disposition of small articles of personal property by the wife, the written assent of the husband being required, the difficulties are created by the section of the Constitution above quoted, and this Court cannot dispense with them. I can add nothing to what I said for the Court in *Walton v. Bristol, supra.*