## STATE v. BETSY ROBINSON.

(Filed April 3, 1907).

*Married Women — Executory Contract — Indictment — Refusal to Work Crops—Motion for New Trial Continued to Next Subsequent Term—Sickness of Judge—Motion Made Then — Appeal Lost — Relief — Merits Decided to Avoid Further Useless Prosecution.*

1. A married woman, without the written consent of her husband, cannot make a valid executory contract, unless it falls within the exceptions of the Revisal, sec. 2094; and where there is no evidence of such assent she cannot be held criminally liable for wilfully refusing to work certain crops on lands "rented" by her, under the Revisal, sec. 3367.

2. When owing to the illness of the trial Judge the cause could not proceed to judgment, and when, without default or laches on the part of the defendant, she had her motion continued and moved for a new trial upon exceptions reserved at the next term, when judgment was pronounced against her, from which she appealed, the appeal was lost under Revisal, sec. 534; but a new trial will be granted, as the loss resulted from an act of God, which she could not foresee, and the consequences of which she could not avoid.

3. In an appeal from a conviction in criminal cases it is not only proper, but the duty of the Supreme Court, when a new trial is granted, to decide upon the legal merits of the case, if it appears that the State cannot ultimately succeed in the prosecution.

CLARK, C. J., concurring in result.

CRIMINAL ACTION, tried before *Council, J.,* and a jury, at October Term, 1905, of the Superior Court of SAMPSON County.

The defendant was indicted under Revisal, sec. 3367, for wilfully refusing to work certain crops on land "rented" to her by the prosecutor, and for wilfully abandoning the same before paying advances made by her landlord. She was at the time she entered into the contract of renting in 1905 and

still is a married woman and lived on the land. Her hus-
band's place of business was in Harnett County, but he came
home every Saturday night and spent Sunday with his fam-
ily. On a certain day in June, the prosecutor ordered her to
work the crop the next Friday, as it was in bad condition,
but she refused to do so, as he testified, but she stated that
her children were sick and she could not leave them for two
weeks, and she told the prosecutor that she would work the
crop on the next Monday. He began working the crop on
Saturday and on Monday the defendant was in the field and,
with others she had employed, was working the crop, when
the prosecutor forbade her to work any longer and ordered
her to leave the land and not to go on it again. She worked
again on Tuesday, when he had her arrested. There was
evidence that the defendant managed the business on the
farm rented to her by the prosecutor. The defendant re-
quested the Court to charge the jury that there was no evi-
dence of defendant's guilt, and they should acquit her. The
jury returned a verdict of guilty. The presiding Judge was
too sick to pronounce judgment, adjourned Court and con-
tinued the motion for judgment. At the next term judgment
of imprisonment for thirty days was pronounced by another
Judge after refusing to grant a new trial, on motion of the
defendant, who excepted and appealed.

*Attorney-General* for the State.
*J. D. Kerr* and *F. R. Cooper* for defendant.

WALKER, J., after stating the case: The defendant cannot
be criminally liable under Revisal, sec. 3367, unless the con-
tract with the prosecutor by which she rented and agreed to
cultivate the land was valid and binding upon her. This
was decided in *State v. Howard,* 88 N. C., 650, as to an
infant, whose contracts are merely voidable, and the prin-

ciple is applicable with greater force to a married woman, whose contracts, as a general rule, are void. In *Howard's case, Justice Ashe,* for the Court, says: "The case then results in this, that the State seeks by this indictment to hold the defendant amenable to the criminal law for the violation of a void contract. With all due respect to the opinion of those who entertain such a proposition, we must say that it seems to us preposterous." See, also, Bishop on Statutory Crimes (1873), sec. 131; *State v. Plaisted,* 43 N. H., 413; *Jones v. State,* 31 Texas Cr. Appeals, 252; 2 McLain's Cr. Law, sec. 846.

Was the contract of the defendant void? Her general executory contracts, not authorized by the statute, have been held to be void. Mordecai's Law Lectures, pp. 328, 329, and 358. It is also settled that the husband is entitled to the society and to the services of his wife, and consequently to the fruits of her industry. She cannot contract to render those services to another without his consent. Those rights were given to the husband, it is said, because of the obligation imposed by the law upon him to provide for her support and that of their offspring, and the right continues unimpaired so long as the legal duty continues to exist. *Syme v. Riddle,* 88 N. C., 463; *Baker v. Jordan,* 73 N. C., 145; *Hairston v. Glenn,* 120 N. C., 341; *Kee v. Vasser,* 37 N. C., 553; *McKinnon v. McDonald,* 57 N. C., 1; *Cunningham v. Cunningham,* 121 N. C., 413. There was no evidence that the husband assented to the contract. Nor do we think there is any evidence in this case to show that the contract falls within any of the classes mentioned in the Revisal, sec. 2094, as contended by the Assistant Attorney-General in his able and well-considered argument, so as to take the case out of the general rule that her executory contracts are void. *Baker v. Garris,* 108 N. C., 218. On the contrary, such facts as we have in this case have been held not to bring the contract of

the married woman within the operation of that section. *Sanderlin v. Sanderlin,* 122 N. C., 1; *Clark v. Hay,* 98 N. C., 421. It comes to this, that in no view is the alleged contract of the defendant binding upon her, and upon the principle already stated she cannot be held responsible criminally for its breach. The evidence, therefore, discloses that she was not guilty of any offense under the law, and the Court should therefore have given the instruction requested by the defendant's counsel. In the view we take of the case, it can make no difference whether the defendant was a tenant or a cropper.

Without intending to discuss the subject or to re-examine the reasons upon which the many decisions of this Court are based with a view of testing their soundness, it may simply be remarked that if we should hold a married woman to be bound by a contract for her services entered into, not only without the consent but against the will of her husband, it might prove disastrous to the marital relation and be productive of a long train of most evil consequences. There should be a clear expression of the policy of the State upon this important question, if there is to be a change, and it will best come from the law-making body.

What we have said about the wife's earnings and the validity of her contracts relates to her general right to contract, rather than to her power to dispose of her property, real or personal. The Legislature has seen fit not to change the law as it has repeatedly been declared to be, although its attention has more than once been called to the matter, and although there have been many sessions of that honorable body since the law was first so declared. We took occasion recently in *Ball v. Paquin,* 140 N. C., 83, to again direct attention to the subject, but an examination of the public statutes will show that there was no responsive legislation at the last session. It would, therefore, seem to be of the opinion that the Consti-

tution and the statute have been properly interpreted, and that it is wise and expedient to let the law remain as it has been settled by the numerous decisions. We are not at all disposed to question the correctness of this conclusion, as the people, by their Constitution, have appointed the Legislature, and not this Court, to declare and formulate the public policy of the State. We decide ·what the law is, and not what it should be. We can construe, but not legislate.

We cannot overlook the fact that the motion for a new trial, upon the exception reserved, was not made during the term of the Court at which the case was tried. This is expressly required to be done by the statute, Revisal, sec. 554, and it has been held that it cannot be made after the term has expired. *Turner v. Davis,* 132 N. C., 187. But it appears in this case that the Judge who presided at the trial was taken ill and could not proceed with the business of the Court. He could not even pronounce the judgment against the defendant. The motion for a new trial could be made at any time before this was done. No laches can be imputed to the defendant. Shall she lose her right to enter her motion for a new trial and to have it heard and considered where there has been no default on her part, but she was prevented from taking the proper ·steps for that purpose solely by the act of God, which is so treated by the law as to affect no one injuriously? The answer to this question should clearly be in the negative. What, then, is her remedy? We must ascertain from analogous cases. When an appeal had been duly taken, and the Judge had lost his notes, so that the case could not be stated, a new trial has always been ordered, unless the appellant had been negligent. *State v. Powers,* 10 N. C., 376; *Isler v. Haddock,* 72 N. C., 119; *Sanders v. Norris,* 82 N. C., 243; *State v. Randall,* 88 N. C., 611; *Commissioners v. Steamboat Co.,* 98 N. C., 163; *Burton v. Green,* 94 N. C., 215; *Owens v. Paxton,* 106 N. C., 480; and especially

*McGowan v. Harris,* 120 N. C., 139, where the authorities
are collected.  Formerly and prior to the enactment of the
present provision of the law (Revisal, sec. 591), the rule
was held to apply to a case where the Judge had died or his
term had expired.  So where the plaintiff was prevented from
issuing an execution by the act of the County Court in
erroneously refusing his application for one, and that Court
was afterwards abolished before its error could be corrected
by the mandate of this Court, to which an appeal had been
taken, it was held that he should not be prejudiced by the
error and the subsequent act of the law in abolishing the
Court from which the execution would have issued.  *Isler v.
Brown,* 66 N. C., 556.  See, also, *Pell v. Linnell,* L. R., 3,
C. P., 441; *Rex v. Edwards,* 4 Taunton, 309.

In *Regina v. Justices,* 15 Q. B. (69 E. C. L.), 88, the
notice of appeal was not served in time by reason of the re-
spondent's death, and the Court held that the condition of
giving notice, annexed to the right of appeal, having been
imposed by the law, and performance of it having become
impossible by the act of God, the appellant was excused from
such performance, and accordingly ordered the appeal to be
heard as if the notice had been duly given.  And substantially
the same ruling was made in *Newton v. Boodle,* 3 C. B. (54
E. C. L.), 795.  There the appellant lost the benefit of a
bill of exceptions tendered to the ruling of a Judge at *nisi
prius,* or at the assizes, by the death of the Judge and without
any default of his own, and the Court permitted him to move
for a new trial, notwithstanding the proper time had elapsed,
so that he might be restored to the position he would have
occupied if the bill of exceptions had not become abortive by
the death of *Chief Justice Tindal* of the Court of Common
Pleas, before it could be sealed and perfected by that Judge
who had presided at the trial.  The remedy was an adequate
and an appropriate one under the practice of the Court at

143—40

that time. Under our procedure, the remedy must be found in merely ordering a new trial. We need not decide that the case should be treated as if the motion had been made, because it would have been made if the defendant's opportunity for making it had not been lost accidentally and by no fault on his part, or because, further, the Solicitor has agreed with the defendant's counsel upon a case on appeal and has thereby consented that it may be so treated, for even if we should so decide there would appear to be error which necessitates another trial. We simply grant a new trial because the defendant has lost her appeal by an act of God, which she could not foresee and the consequences of which she could not avoid. As said by *Chief Justice Taylor* in *State v. Powers, supra,* "under the circumstances, there is no other mode by which the justice of the case can be attained."

Our opinion on the merits has been expressed, thinking that it might end the prosecution unless the facts as now presented are materially changed, which does not now seem to be probable. Where a case must go back for another trial, it is not only proper, but it may be fairly regarded as a duty of the Court to decide upon the legal merits, if it appears that the State cannot ultimately succeed in the prosecution or the plaintiff in the litigation. It prevents the useless expenditure of time and the unnecessary accumulation of costs, and there are other and perhaps weightier reasons for taking such a course.

Why order a new trial unless there was error, and how can we know whether there was error or not unless we examine into the merits of the case?

New Trial.

CLARK, C. J., concurring in result: The defendant has lost her right of appeal by no fault of her own, but in consequence of the illness of the Judge, who was taken ill and

could not proceed to judgment. The succeeding Judge could neither impose judgment nor "settle a case on appeal," as he had no personal knowledge of the incidents of the trial. The only remedy is in ordering a new trial. Indeed, the Judge might well have instructed the jury that there was no evidence that the defendant voluntarily abandoned the work.

This renders it *obiter* to discuss the merits of the case. It is true that *Syme v. Riddle,* 88 N. C., 463, and some cases following it, have held (not without question, however) that a husband is entitled to the earnings of his wife; but in my judgment that decision is opposed to the entire thought and civilization of the day and ought not to be held now as authority. It was based upon the preconceived opinion of Judges who rested their decision upon the barbarous doctrine of the common law under which a woman upon marriage became *non sui juris,* and her husband took her property and her earnings as fully as a master became entitled to the property and earnings of his slave. The decision in *Syme v. Riddle* is directly opposed to the language of the Constitution, Art. X, sec. 6: "The real and personal property of any female in this State acquired before marriage, and all property, real and personal, to which she may after marriage become *in any manner entitled,* shall be and remain the sole and separate estate and property of such female." This guarantees her control of her property of all kinds, whether acquired before or after marriage, and it can make no difference whether it is income from her property or earnings from her labor. Of the two, the wife's right to control the latter is stronger of natural right. There can be no force in the argument used in *Syme v. Riddle,* that her earnings are needed for the support of the family, and therefore her husband should have them, for there is no guarantee that he will so apply them; indeed, there is much less certainty thereof than that the wife and mother will use her earnings for the benefit of her children. Besides,

by the same token, as it devolves especially upon the husband
to support his wife and children, there is a stronger reason
that he shall not dispose of his earnings without his wife's
concurrence than that she shall be constrained not to receive
and use her own earnings without the husband's consent. By
unanimous decision of the Court of Appeals in England in
the *Clilheroe case (Reg. v. Jackson),* Q. B. D. (1891), 697,
it was held that the husband could not enforce the unwilling
companionship of the wife. The law now recognizes the
equality of rights of both parties to the marital relation, and
no longer asserts the inferiority or subjection of the woman.
But argument ought to be out of the question in view of the
language of the Constitution. In *Syme v. Riddle,* 88 N. C.,
463, and that class of cases, the Court overlooked the fact that
there is no statute with us giving the wife's earnings to the
husband, and that the Constitution had entirely abrogated the
common-law doctrine as to the subjective status of the wife.

In England the Court of Chancery by judicial legislation,
pure and simple, originated the status of the wife's separate
property, and created the doctrine, by judicial enactment, of
"charging in equity," which has since been completely re-
pealed and effaced by the more progressive action of Parlia-
ment. In 1870 Parliament enacted that a married woman
was entitled to her earnings, for the above action of the courts
had applied only to the wealthier classes, to married women
owning property, which the Court of Chancery could reach
and control. In 1882 Parliament enacted in substance the
provision of the North Carolina Constitution, that a married
woman's property of every description, whether acquired be-
fore or after marriage, shall be in her sole control, and went
further by dispensing with any necessity of the husband's
assent to conveyances of the wife's property (which is the
only restriction upon her freedom of control required by our
Constitution), and gave the wife absolute freedom of contract.

The Judges of England being, as sometimes is the case with courts, unable or unwilling to recognize the completeness of a change made by an enactment of the law-making power, held, notwithstanding the broad terms of the Act of 1882, that if a married woman possessed no property at the time she made a contract, her subsequently acquired property could not be subjected to execution. In 1893 Parliament swept away this refinement, and ever since in England a married woman's property rights and her right to contract are the same as her husband's. The same is true of New York (from whose Constitution the married woman's clause in our Constitution is copied), and in most other States. 1 A. and E. Enc. (2 Ed.), 522. The above summary of the changes in the English law is taken from the Century of Law Reform, 358-370; Dicey's Law and Opinion in England 373, 395. Professor Dicey in summing up these statutory changes says that they made simple and plain and more complete the changes which the Court of Chancery by ingenious and successive tentative decisions had made in favor of the daughters of the wealthy, and that Parliament applied the benefits of "the change to the daughters of the poor as well as in favor of the daughters of the rich," which the courts had done.

It would seem, indeed, that the wife here had a right to her earnings; the Constitution so says, and there is certainly no statute upon our books to the contrary. As the husband went home every Saturday and spent Sunday with his wife, and there is no evidence that he raised any objection to her working the crop, the jury would doubtless have found upon proper instructions that the defendant's contract for work was to aid in the support of herself and family. They could hardly have supposed in reason that it was for any other purpose. This being so, she had a legal right to agree that the product of her labor should go to the payment for provisions furnished her, being necessaries for herself and family. The Consti-

tution requires the assent of the husband only to "conveyances" by her, not to sales of personalty, as her crop when gathered. *Vann v. Edwards,* 135 N. C., 661. As Professor Dicey said of the Parliament of England we may say of our Constitution, that it was not intended that the rich woman should control the income (as well as principal) of her property, while leaving the petty earnings of the poor woman, from her needle or otherwise, to the control of the husband, to be squandered in drink, or otherwise at his will. The emancipation was to all women alike, and it matters not in what manner the income is derived, whether from earnings or property, and whether they become entitled thereto before or after marriage.

In *Chrislopher v. Norvell,* 201 U. S., 216, it is held that a married woman owning stock in a National bank is subject to a personal judgment, like every one else, for an assessment on the stock, notwithstanding that under the laws of the State a married woman cannot enter into a contract, because since the laws of the State do not incapacitate her to own such stock, she assumes the liability incident to its ownership. For the same reason, since the laws of this State do not incapacitate a married woman to work a crop as tenant or on shares, she is liable to the criminal law, to the same extent as any one else, for receiving advances on such crop and afterwards abandoning the work. Her liability for such conduct arises under the statute, and not by virtue of her contract. *Christopher v. Norvell, supra.*

There has been as to married women some approximation to the Constitution in late legislation. Laws 1901, ch. 617, now Rev., 2016; *Finger v. Hunter,* 130 N. C., 529; and this Court has often recommended more effective legislation to conform to the Constitution, *Bank v. Howell,* 118 N. C., 273; *Ball v. Paquin,* 140 N. C., 96. In view of the present great confusion in the law as shown in the table in *Vann v. Edwards,* 128 N. C., 431-435, such legislation is badly needed.

STATE *v.* ROBINSON.

There is a very important question, which, however, like the above, it is not necessary to decide, as there is really no case before us, since a new trial has been ordered on the ground that there is no valid judgment and hence no appeal presenting the merits.  It is well, however, to note the question, that it may not be thought that it was tacitly approved.  This indictment is under Revisal, 3367, which provides that if any tenant or cropper shall procure advances from a landlord to enable him to make a crop on the land rented to him, and then wilfully abandon the same without good cause and without paying for such advances, he is guilty of a misdemeanor and liable to fine and imprisonment. This and the almost identical provisions of section 3366 apply only to certain counties named therein.  As such conduct is merely a breach of contract, and there is no crime if the advances are repaid, a grave question arises whether these sections are not in violation of the provision in the State Constitution (Art. I, sec. 16) forbidding "imprisonment for debt, except in cases of fraud," and also whether they do not conflict with the Thirteenth Amendment to the Constitution of the United States against "involuntary servitude, except as a punishment whereof the party shall have been (*i. e.,* previously) duly convicted."  If the service is enforced unless the debt is paid, is it not "involuntary servitude?"  *Clyatt v. U. S.,* 197 U. S., 207; *Robertson v. Baldwin,* 165 U. S., 275.

This statute is doubtless a very convenient one for landlords in the counties named.  But if upon full consideration it shall prove to be unenforcible it may result in great loss to them.  While in most cases its operation may prove a convenience to the tenant in aiding him to get supplies, and not a hardship, it is capable of great abuse.  It is at least wise to call attention to the matter, that it may not be supposed that the Court has passed upon the enforcibility of these sections.